UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**LEE NEWSOME,**

    Plaintiff,

    v.                                           Case No. 13-CV-1379

**WISCONSIN CENTRAL LTD.,**

    Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

      This action arises out of injuries sustained by the plaintiff, Lee Newsome ("Newsome"), during the course of his employment with the defendant, Wisconsin Central Ltd. ("Wisconsin Central"). Newsome seeks damages for his injuries under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* ("FELA"). Wisconsin Central now moves for partial summary judgment on Newsome's loss of future earning capacity claim, arguing that Newsome has failed to present evidence establishing that his future earning capacity would be impaired as a result of his injuries. The issue has been fully briefed and is ready for resolution. For the reasons that I explain in this decision, the defendant's motion for partial summary judgment is denied.

### SUMMARY JUDGMENT STANDARD

      Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## UNDISPUTED FACTS

On July 31, 2010 while working at Wisconsin Central's Fond du Lac rail yard, Newsome suffered a crush injury to his right foot when a rail suspended from a crane fell on him. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 29.) As a result of his injury, Newsome remained off work for just under one year. (*Id.* ¶ 7.) Newsome was

2

Case 2:13-cv-01379-NJ   Filed 09/11/15   Page 2 of 12   Document 46

released to return to work for Wisconsin Central without restrictions in June 2011. (*Id.*) When Newsome returned to work following his injury, he initially returned as a welder's helper, the same position that he held at the time of the incident, and began working as a mobile mechanic shortly thereafter. (*Id.* ¶ 8.) Both the welder's helper and mobile mechanic jobs are physically demanding. (*Id.*) A mobile mechanic is classified as a medium physical exertion position and is skilled in nature, and involves traveling throughout Wisconsin Central's Northern Division and repairing railroad equipment at various locations along Wisconsin Central's track. (*Id.* ¶ 10.) As of today's date, Newsome continues to work full-time and unrestricted as a mobile mechanic for Wisconsin Central, a position that he has worked continuously since shortly after he returned to work for Wisconsin Central nearly three and a half years ago. (*Id.* ¶ 9.)

Newsome testified that he was able to do his current job with "a lot of pain" and that the pain has worsened over time. (Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 1, Docket # 35.) Newsome wants to do his current job "until [he] can't" and testified that when he can no longer perform his current job he will "figure out something from there." (*Id.*) When he can no longer perform the job of mobile mechanic, Newsome desires to seek alternative employment with Wisconsin Central. (DPFOF ¶ 14.)

After Newsome was released to return to work without restrictions in June 2011 by his treating orthopedic surgeon, Dr. Jason Roberts, Newsome retained Dr. Roberts as an expert in this case in June 2012. (*Id.* ¶ 11.) Once retained as an expert, Dr. Roberts issued a report in which he opines that as a result of Newsome's injury, he could work anywhere from a minimum of one to two more years and up to fifteen to twenty more years as a mobile mechanic for Wisconsin Central. (*Id.*) Relying on Dr. Roberts' report, Newsome's

3

vocational expert, James Jackson, opined that Newsome has a shortened work-life expectancy at his current job. (*Id.* ¶ 12.) However, Newsome has already exceeded by one and a half years the minimum estimate about which Dr. Roberts opined. (*Id.* ¶ 13.)

Wisconsin Central advised Newsome, through his counsel, of several open positions at Wisconsin Central, including Yardmaster, Trainmaster, Damage Prevention Officer, and Rail Flaw Detector Assistant Operator, that Newsome is physically qualified to work notwithstanding his injury, and that he is cognitively qualified to work. (*Id.* ¶ 15.) Training is available for these positions, to the extent Newsome needs it, and Newsome is aware of this fact. (*Id.* ¶ 16.) Newsome testified, however, that he is a "hands-on person for working" and that he is "not a paper guy." (Pl.'s SMF ¶ 1.) As such, the paperwork aspect of jobs such as Damage Prevention Officer "turns [him] away." (DPFOF ¶ 19.) Depending on the position, should Newsome successfully apply and get one of these alternative positions, he will be earning more money than he does as a mobile mechanic. (DPFOF ¶¶ 24-30; Pl.'s SMF ¶ 13.)

## ANALYSIS

Congress originally enacted the FELA in 1906 to create a federal remedy for railroad employees injured on the job by the negligence of their employers. *Kulavic v. Chicago & Illinois Midland Ry. Co.*, 1 F.3d 507, 512 (7th Cir. 1993). This statute "serves to provide an injured worker with an expeditious recovery and also gives a railroad the incentive to maintain vigilance over the safety of its workers and, concomitantly, the conditions in which they must work." *Id.* An injured railroad employee can recover under the FELA as long as the employer's negligence "played any part, even the slightest, in producing the injury . . . for which damages are sought." *Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 506

4

(1957). The FELA is a broad remedial statute to be construed liberally in order to effectuate its purpose. *Kulavic*, 1 F.3d at 512. In addition to compensation for pain and suffering, the FELA allows damages for economic harms such as loss of past and future wages and impairment of earning capacity that result from the injury. *See, e.g.*, *Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 160-62 (1968) (affirming award of damages which included past and future wages). To recover for lost earning capacity, a plaintiff must produce "'competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him . . . . [A] plaintiff must show that his injury has caused a diminution in his ability to earn a living.'" *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir. 1992) (quoting *Gorniak v. National Railroad Passenger Corp.*, 889 F.2d 481, 484 (3d Cir.1989) (FELA case)).

The parties do not cite, and I have not found, a Seventh Circuit decision addressing loss of earning capacity in a FELA case. Further, the parties disagree on the operative case law from other circuits. Newsome relies principally on two cases from the Third Circuit, *Gorniak* and *Wiles v. New York, Chicago, and St. Louis Railroad Co.*, 283 F.2d 328 (3d Cir. 1960). Wisconsin Central relies on *Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269 (3d Cir. 1995) and *DeChico v. Metro-North Commuter Railroad*, 758 F.2d 856 (2d Cir. 1985). However, on close reading, the cases stand for the same proposition and generally agree that *Gorniak* and *Wiles* are the appropriate legal standard in these cases. As the Sixth Circuit succinctly stated, "*Wiles* and *Gorniak* stand for the proposition that a FELA plaintiff can establish a claim of impaired future earning capacity by showing that, because of his injury, he will have difficulty obtaining work except with his present employer, or that he will have a decreased ability to weather adverse economic circumstances, such as a layoff."

5

*Taylor v. Consolidated Rail Corp.*, No. 96-3579, 1997 WL 321142, *4 (6th Cir. June 11, 1997) (unpublished). It should also be noted that the Seventh Circuit has favorably cited *Gorniak* on two occasions as the standard for assessing loss of earning capacity, although not in the context of FELA. *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952-53 (1998); *McKnight*, 973 F.2d at 1370.

In *Gorniak*, a materials handler for Amtrak injured his right shoulder lifting a 325 pound cylinder and sued Amtrak under the FELA, claiming that Amtrak's negligence caused his injury. 889 F. 2d at 482. The jury awarded the plaintiff $104,000, $35,000 of which represented his lost earning capacity. On appeal, the employer challenged the sufficiency of the evidence to support the jury's award for the plaintiff's lost earning capacity. The plaintiff presented evidence from two orthopedic surgeons who testified that the injury resulted in a permanent disability which required him to refrain from activities involving heavy lifting and overhead extensions of the right arm. *Id.* at 482. When the plaintiff returned to work he was assigned the job of ticket clerk, which paid seven dollars more a day than his pre-injury position. *Id.* The plaintiff acknowledged that his shoulder injury did not hinder his ability to work as a ticket clerk. *Id.* The evidence further showed that the plaintiff was able to work in certain other positions with Amtrak, however, the collective bargaining agreement provided for a seniority system in which junior employees could be "bumped" from their positions in the case of a reduction in Amtrak's work force. *Id.*

Amtrak argued that the evidence provided no reasonable basis upon which to conclude that the plaintiff suffered a loss of earning capacity as a result of his shoulder injury. *Id.* at 483. Amtrak argued that the plaintiff was fully able to obtain less strenuous

employment, noting he was employed with Amtrak in a secure manner and made more money than he did prior to the injury. *Id.*

The *Gorniak* court discussed the Third Circuit's decision in *Wiles*, in which it reversed the district court's decision to set aside the jury's award of $20,000 for lost earning capacity because it was based on speculation. In *Wiles*, a medical expert testified at trial that the plaintiff would have trouble getting another job in heavy industry because "no employer would wish to hire him after discovering, by way of a routine pre-employment physical, his history of back problems," though the expert did not testify that the plaintiff was unable to continue work in heavy industry. *Id.* The *Gorniak* court stated that:

> We read *Wiles* as allowing a FELA plaintiff to recover a verdict for future lost earning capacity if he has produced competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him. This means that a plaintiff need not, as a prerequisite to recovery, prove that in the near future he will earn less money than he would have but for his injury. Rather, a plaintiff must show that his injury has caused a diminution in his ability to earn a living. Such a diminution includes a decreased ability to weather adverse economic circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment. *Wiles* also expresses a preference for leaving the resolution of any uncertainty about whether such circumstances will come to pass to a properly instructed jury; a jury that may consider and weigh all the relevant factors and determine what price to place on a narrowing of a plaintiff's economic horizons.

889 F.2d at 484. The plaintiff in *Gorniak* presented expert testimony that he was subject to permanent physical restrictions that would prevent him from performing in certain types of positions, and the Third Circuit found his evidence sufficient to support the jury's award, noting that even if the plaintiff remained with Amtrak (and Amtrak made a light-duty position permanently available to him), he "could still recover since he is under no obligation to remain with Amtrak, and the fact that his injuries hindered his ability to obtain

7

other employment if he wished was one the jury could consider in deciding to award him damages." *Id.*

In *Fashauer*, another Third Circuit case, the court of appeals embraced the principles articulated in *Gorniak* and *Wiles* and opined that the plaintiff need not call a vocational expert to establish loss of earning capacity. 57 F.3d at 1284. However, the *Fashauer* court found that the plaintiff produced no competent evidence supporting his claim for loss of earning capacity. *Id.* The court specifically considered the fact that the evidence "consisted almost entirely of medical testimony, only tangentially related to [the plaintiff's] economic horizons, that the accident caused a permanent injury to his shoulder that restricted physical activity." *Id.* The court found that the plaintiff failed to provide testimony that he would have difficulty obtaining work with a different employer or that jobs he could do after the injury were less lucrative than his railroad job. *Id.* at 1285. Further, the court stated that "[n]o witness even opined that [the plaintiff's] injury limited his economic potential." *Id.*

Similarly, in *DeChico*, the Second Circuit utilized the *Gorniak* and *Wiles* standard; however, it distinguished *Wiles* from the case before it on the facts. In *DeChico*, the court of appeals affirmed the district court's refusal to allow a jury to consider a FELA plaintiff's lost earning capacity claim on the ground that it was too speculative. In so finding, the court acknowledged (relying on *Wiles*), that there "may well be cases in which the likelihood that a plaintiff with a permanent injury will eventually leave his present job and be forced to compete in an unreceptive labor market is sufficiently great to allow that plaintiff to seek compensation for the limitations placed upon his economic horizons." 758 F.2d at 861. However, the *DeChico* court found that this was not such a case because the plaintiff indicated that he expected to continue in the job he worked at the time of his injury and that

8

he could exercise his seniority rights as a foreman or supervisor if removed from his current position. *Id.*

Applying these cases here, the issue before me is whether Newsome has produced admissible evidence that would support a reasonable jury verdict awarding damages for impairment of earning capacity. In support of his claim for impairment of earning capacity, Newsome relies on his own testimony and the testimony and expert reports of several expert witnesses. As a preliminary matter, Wisconsin Central challenges the admissibility of each of the expert reports. For the reasons explained below, I need not address Wisconsin Central's challenges at this time.

On the merits, Wisconsin Central argues that Newsome's evidence is more akin to *DeChico* and *Fashauer*. This argument is not without merit. However, Newsome's evidence on the limitations on his future economic potential is distinguishable from those cases in two respects. First, Newsome's evidence suggests that he is more economically vulnerable than the plaintiff in *DeChico*. Like the plaintiff in *DeChico*, who indicated that he expected to continue his job as a shop superintendent, Newsome testified that he planned on doing his job as a mobile mechanic until he cannot do it anymore. However, Newsome lacks the seniority rights of the *DeChico* plaintiff to protect him during any economic storms or changes faced by his employer. Similarly, although Wisconsin Central has stated it will have other positions available for Newsome when he can no longer work as a mobile mechanic, and in some of the positions he can even earn more, those positions are not guaranteed. Newsome would need to apply and presumably compete for those positions. Even if that were not the case, Newsome should not be tied to working for Wisconsin Central for the remainder of his career. *See Wiles*, 283 F.2d at 332 ("Because of his present employment

9

Wiles has not yet suffered economic loss but if he cannot obtain gainful employment elsewhere he is chained to his present job in a kind of economic servitude.").

Second, unlike the plaintiff in *Fashauer*, Newsome has presented evidence from a vocational expert that his injury will limit his economic potential. Specifically, Newsome's vocational expert, Jackson, opined that due to his right foot injury, Newsome "does not have competitive transferable job skills commensurate with a less physically demanding occupation which would offer him the same economic status that he has enjoyed with the date of injury employer." (Affidavit of Elizabeth O. Bryant ¶¶ 7-8, Expert Report of James Jackson at 10, Exh. 5 to Deposition of James Jackson, Docket # 31-6 and 31-7.) Jackson further opined that "I believe that [Newsome] will not be able to find physically suitable work with a different employer which will allow him to maintain his same economic status." (Expert Report of James Jackson at 8.)

Wisconsin Central challenges the admissibility of Jackson's opinion that Newsome is not suited for alternative jobs with the railroad (specifically yardmaster and trainmaster) and Jackson's opinion that Newsome will not be able to work as a mobile mechanic for "anywhere near" 15 to 20 years. Wisconsin Central does not, however, challenge the admissibility of Jackson's opinion regarding whether Newsome currently has competitive transferable job skills that would allow him to find physically suitable work with a different employer. Whether an expert is qualified to render an opinion must be considered on a question–by–question basis. *See Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)) ("'The question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question.'"). It is the job of vocational

experts to opine as to what jobs a person is capable of performing. Thus, Jackson can render an opinion as to the transferability of Newsome's skills to a different employer.

Accordingly, drawing all inferences in a light most favorable to Newsome as the non-movant, and given the fact that this is a FELA case and there is a preference for leaving the resolution of issues of loss of earning capacity to a properly instructed jury, *see Gorniak*, 889 F.2d at 484 ("*Wiles* also expresses a preference for leaving the resolution of any uncertainty about whether such circumstances will come to pass to a properly instructed jury; a jury that may consider and weigh all the relevant factors and determine what price to place on a narrowing of a plaintiff's economic horizons"), I find that Newsome has presented competent evidence suggesting that his injuries have narrowed his range of economic opportunities. This evidence is sufficient to survive summary judgment. For these reasons, the defendant's motion for partial summary judgment is denied.

Finally, as indicated earlier, Wisconsin Central has also moved in its reply brief to exclude the opinions of Dr. Roberts, Jackson, Michael Koch, and Dr. Jerome Sherman. A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771-72 (7th Cir. 2014). Wisconsin Central's *Daubert* challenges have not been fully briefed and thus this is a question for another day.

### ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for partial summary judgment (Docket # 28) is **DENIED**. The Clerk of Court will contact the parties regarding further scheduling in this case.

11

Dated at Milwaukee, Wisconsin this 11th day of September, 2015.

               BY THE COURT:

               *s/Nancy Joseph*_____
               NANCY JOSEPH
               United States Magistrate Judge